## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| RONALD L. LIMBAUGH, JR., | § | |
| **Plaintiff,** | § | |
| v. | § | Civil Action No. 3:22-CV-02126-B-BH |
| | § | |
| KILOLO KIJAKAZI, | § | |
| ACTING COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| **Defendant.** | § | Referred to U.S. Magistrate Judge[1] |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Based on the relevant filings, evidence and applicable law, the final decision of the Commissioner of Social Security (Commissioner) denying the plaintiff's claims for disability insurance benefits (DIB) under Title II of the Social Security Act should be **REVERSED**, and the case should be **REMANDED** for an award of benefits.

## I.    BACKGROUND

Ronald L. Limbaugh, Jr. (Plaintiff), filed his application for DIB on September 22, 2016, alleging disability beginning November 11, 2014. (doc. 16-1 at 430-31.)[2] His application was denied initially and upon reconsideration. (*Id.* at 114-21, 123-31.) After requesting a hearing before an Administrative Law Judge (ALJ), he appeared and testified at a first hearing on April 2, 2018, during which he amended his alleged onset date to June 19, 2015. (*Id.* at 49-76.) On May 30, 2018, the ALJ found him not disabled. (*Id.* at 136-45.) The Appeals Council granted Plaintiff's request for review, and on May 6, 2019, it remanded the case, in relevant part, for further evaluation of his medically determinable mental impairments and clarification of assessed limitations on his

---

[1] By *Special Order 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

occupational base. (*Id.* at 152-54.) On August 11, 2020, the Appeals Council ordered the ALJ to comply with its May 6, 2019 order. (*Id.* at 161-62.)

At a telephonic hearing on February 4, 2021, Plaintiff appeared and testified before a second ALJ. (*Id.* at 79-102.) On February 26, 2021, the ALJ found him not disabled. (*Id.* at 171-84.) After granting his request for review, the Appeals Council remanded and ordered the ALJ to support his determination with record citations and to further consider the treating source opinion and explain the weight given to that opinion evidence. (*Id.* at 193-94.)

At a telephonic hearing on March 1, 2022, Plaintiff appeared before the second ALJ. (*Id.* at 105-13.) On March 29, 2022, the ALJ found him not disabled. (*Id.* at 22-35.) On April 11, 2022, Plaintiff appealed the ALJ's decision to the Appeals Council. (*Id.* at 427-28.) It denied his request on July 27, 2022, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 7-10.) He timely appealed the Commissioner's decision under 42 U.S.C. § 405(g.) (doc. 1.)

**A.** **Age, Education, and Work Experience**

Plaintiff was born on June 20, 1965; he was 51 years old on December 31, 2016, his date last insured (DLI). (doc. 16-1 at 430, 465.) He had at least a middle school education and past relevant work as a floor installer. (*Id.* at 65, 493.)

**B.** **Medical, Psychological and Psychiatric Evidence**

On November 11, 2014, Plaintiff was taken to the emergency room (ER) after a 400-pound metal sheet fell on his head and neck as he was working. (*Id.* at 600, 626.)

*1. Medical Evidence*

The day of his injury, Plaintiff denied any numbness or weakness, but he had a headache and a "moderate" pain level of 6-8 out of 10. (*Id.* at 596, 600.) He had intact range of motion and no evidence of neurological deficits, but he was positive for tenderness in the cervical spine (C-

spine). (*Id.* at 596, 601.) A C-spine computed tomography (CT) scan revealed mild diffuse degenerative changes to the endplates and posterior elements with no significant acute abnormalities; a head CT scan revealed no acute intracranial abnormalities with normal gray-white differentiation. (*Id.* at 605-06.) He was discharged and prescribed medication for pain and for nausea. (*Id.* at 602-03.)

On November 12, 2014, Plaintiff returned to the ER complaining of low back pain and shoulder soreness. (*Id.* at 610-20.) He reported medication noncompliance. (*Id.* at 612.) He could move all four extremities and had a full range of motion in his shoulders, but he had tenderness in his midline lumbar spine (L-spine), and thoracic spine (T-spine). (*Id.* at 616.) L-spine x-rays revealed no acute fracture, but he had chronic appearing bilateral pars interarticularis defects at the L5 with grade 1 spondylolisthesis and secondary degenerative changes at the L5-S1 intervertebral disc, and T-spine x-rays revealed mild multilevel degenerative disc disease. (*Id.* at 619-20.)

On November 17, 2014, Plaintiff visited Concentra Medical Centers (Concentra) due to pain and stiffness in the neck and back, numbness in both arms, and mild and intermittent headaches with occasional dizziness. (*Id.* at 643-47.) He reported a 7/10 pain level in his joints, muscles, and back; he had not yet filled his prescribed medications. (*Id.* at 645.) He was assessed with cervical strain, thoracic region strain, lumbar strain, and head contusion; prescribed Meloxicam and Methocarbamol; and referred to physical therapy. (*Id.* at 646.) He was released to work, but he could lift 20 pounds and push/pull 40 pounds. (*Id.*) On November 19, 2014, Plaintiff reported that his symptoms were "much better", he was not taking any medications, and he was still not working because no light duty work was available. (*Id.* at 641-42.) He declined physical therapy, requested release from care, and was found "ready to resume work". (*Id.* at 641.) His T-spine had no kyphosis, his C-spine and L-spine had normal lordosis, his spine had full range of

motion, and he had negative bilateral straight leg raises. (*Id.* at 642.) He had normal gait, normal range of motion in his neck and back, and 5/5 motor strength. (*Id.* at 646.)

In April 2015, Plaintiff returned to Concentra twice, complaining of pain that "never went away" and numbness in his left leg and from his left shoulder to his fingertips; he reported that he was not taking pain medication. (*Id.* at 634-39.) Both times, he had normal strength and gait, full range of motion, and normal palpation, but he had tenderness and painful range of motion in his left paraspinals, deltoid, and trapezius muscles at his second visit. (*Id.*) At his first visit, he had negative straight leg raises bilaterally, no signs of left shoulder impingement, and 2+ deep tendon reflexes in his left biceps and brachioradialis. (*Id.* at 638-39.) Both times, he was assessed with cervical strain, thoracic region strain, numbness and tingling in left arm, head contusion, and cervical disc herniation or cervical strain; he was also assessed with T1 vertebral fracture at the second visit. (*Id.* at 635, 637.) At the first visit, he was permitted to return to work with no work restrictions; he was released to work at the second visit but was limited to constantly lift 10 pounds and constantly push/pull 20 pounds. (*Id.*)

From April 2015 to December 2015, Plaintiff underwent magnetic resonance imaging (MRI) of his spine and shoulders. (docs. 16-1 at 635, 661-62, 726, 730, 741-42; 16-2 at 2.) A C-spine MRI revealed a disc herniation arising from the posterior segment of the intervertebral discs causing mild impression on the thecal sac without significant stenosis, and a non-displaced fracture. (doc. 16-1 at 635, 661, 726.) An L-spine MRI revealed grade 1 anterolisthesis at L5-S1 with chronic bilateral L5 pars defects, moderate neural foraminal stenosis due to degenerative changes, vertebral malalignment, a shallow right-sided protrusion with mild narrowing right lateral recess and neural foramen, and multilevel degenerative changes. (*Id.* at 661-62.) A T-spine MRI revealed a 4 mm left paracentral disc protrusion or herniation mildly flattening the left ventral cord

contour, with an otherwise adequate central canal, some multilevel facet degenerative changes, and an old and unhealed fracture or congenital cleft through the T1 spinous processes. (*Id.* at 662.) A left shoulder MRI showed rotator cuff tendinosis primarily supraspinatus and infraspinatus with probable very low grade chronic interstitial partial tearing of the junction of the 2 tendons, degenerative fraying posterior superior labrum, and mild hypertrophic osteoarthrosis acromioclavicular (AC) joint. (*Id.* at 662, 730.) Finally, a right shoulder MRI revealed supraspinatus and infraspinatus tendinosis, low-grade insertional partial tear of the junction of the tendons with small resorptive cysts, labral degenerative tear with paralabral cyst along the spinoglenoid notch, and degenerative tears to the anterior inferior and inferior labrum, but intact labral anchor and superior labrum. (docs. 16-1 at 662, 741-42; 16-2 at 2.)

On May 11, 2015, electrodiagnostic testing at Concentra revealed no evidence of left upper extremity radiculopathy or brachial plexopathy. (doc. 16-1 at 629-32.) Plaintiff complained of neck pain that radiated to his left arm with left arm numbness and tingling. (*Id.* at 631.) He had normal gait, his left upper extremity had 4+-5-/5 strength, he reportedly had decreased sensation to light touch, and his bilateral upper extremities reflexes were 1 to 2+. (*Id.*) He was advised to continue any work restrictions and to undergo physical therapy pending a spine specialist's approval. (*Id.*)

On May 20, 2015, Plaintiff visited Bryce Benbow, D.O. (Spinal Surgeon), at the Minimally Invasive Spine Institute (Spine Institute), due to pain and numbness in his extremities. (*Id.* at 725-27.) He had normal straight leg raises and 4-5/5 strength and tingling with light touch in his low extremities, but he had painful heel and toe walking, tender and decreased L-spine range of motion, painful and decreased C-spine range of motion, decreased sensation to light touch at C6-C7, and 4-5/5 left upper extremity strength. (*Id.*) His medications were refilled, and he was restricted from working until after he completed physical therapy and new imaging. (*Id.* at 727.)

From July 6, 2015, to July 20, 2016, Plaintiff returned to Spine Institute at least 9 times, complaining of neck, back, and shoulder pain. (*Id.* at 728-38, 743-47, 750-60, 762-69.) He had 4/5 strength with decreased sensation to light touch and tingling or hypersensitivity in the bilateral low extremities. (*Id.* at 728-29, 733-35, 737-38, 745-46, 750, 752-53, 757-58, 763-64, 767-68.) He had intact rotator cuff strength but left shoulder range of motion pain with tenderness to palpation, and he was positive for Hawkins and empty can testing for impingement. (*Id.* at 729, 732, 738, 744-45, 753.) He had normal gait and station but painful heel and toe walking and T-spine tenderness but normal range of motion. (*Id.* at 728-29, 733-35, 737, 745-46, 750-51, 757, 763, 767, 773.) By August 2015, he had not yet been approved for physical therapy, and he preferred to resolve his severe dental pain before his spine pain. (*Id.* at 730, 732.) In September 2015, he was not taking any prescribed pain medication, he had been to physical therapy twice, and he was found to be a candidate for cervical epidural steroid injections (ESIs). (*Id.* at 736, 738.) In January 2016, 10 sessions of physical therapy had provided no relief to his low back and legs, he had been denied coverage for cervical ESI, and he was again referred for injections. (*Id.* at 743, 747.) In May 2016, his first caudal lumbar ESI reportedly provided only 2 days of 30 percent relief. (*Id.* at 760, 762.) In June 2016, a L5-S1 transforaminal ESI was recommended. (*Id.* at 764.) In July 2016, he complained of 10/10 back pain, his requested ESIs had been denied twice, and the denial was being reviewed. (*Id.* at 766.) During this time, Spinal Surgeon completed five Texas Worker's Compensation work status reports in which he restricted Plaintiff from returning to work. (doc. 16-2 at 1, 9-10, 19, 28.) The activity restrictions sections (e.g., posture, motion, lift/carry) of the reports were left blank, but the first report indicated neck, back, and left arm limitations. (*Id.*)

On March 12, 2016, Steve Gao, M.D. (First Examiner), performed a designated doctor examination based on the medical record and a physical examination. (doc. 16-2 at 75, 99, 316.)

On July 14, 2016, Plaintiff went to urgent care at PrimaCare Medical Centers (PrimaCare), complaining of stable but persistent cervical, lumbar, and thoracic pain relating to his work injury. (doc. 16-1 at 689-90.) He described his "stabbing" back pain at a severity level of 8. (*Id.* at 689.) He was diagnosed with chronic cervical, low back, and thoracic back pain, and he was referred to an orthopedic surgeon. (*Id.* at 690-91.) Plaintiff returned on August 1, 2016, complaining of headaches, back pain, and neck pain that radiated to his arms and thighs. (*Id.* at 693-96.) His symptoms were aggravated by extension, flexion, and twisting, and nothing provided relief. (*Id.* at 693.) He had been taking Naprosyn, and his back condition was "stable" and "persistent[]". (*Id.* at 693-94.) His spine was tender to palpation with a reduced range of motion. (*Id.* at 695.) He was assessed with chronic cervical pain and chronic bilateral low back pain with bilateral sciatica. (*Id.*) In a work status report dated August 1, 2016, Cary Fitzgerald, FNP (Nurse Practitioner) restricted Plaintiff from returning to work for an "unknown" period. (doc. 16-2 at 273.)

On August 4, 2016, Rochelle Mayfield, D.C. (Second Examiner) reviewed the medical records and conducted an in-person designated doctor evaluation. (doc. 16-1 at 658-74.) Plaintiff had tenderness and muscle spasms throughout his spine, reduced C-spine range of motion, decreased bilaterally motor function and sensation at C6-C8, and upper extremity tenderness, muscle spasms, and decreased range of motion. (*Id.* at 666-67.) He gave no effort on the L-spine examination due to pain. (*Id.* at 667.) He had 5/5 strength, partial tear of left rotator cuff, C-spine and T-spine herniated nucleus pulposus (HNP), head injury, and left shoulder soft tissue injury. (*Id.* at 669-73.) Physical therapy and injections had not helped his spinal injuries and additional recommended injections had not yet been performed. (*Id.* at 673.) On September 16, 2016, Second Examiner limited Plaintiff to lift/carry 15 pounds for 2 hours per workday. (*Id.* at 655.)

On August 21, 2016, Plaintiff went to the ER for chronic back and neck pain. (doc. 16-2 at

533-37.) He reported a 10/10 pain level with difficulty walking, but he denied any weakness or numbness. (*Id.* at 533.) He was diagnosed with "[p]robable" chronic nontraumatic thoracic and lumbar back pain, prescribed medication, and referred to pain management. (*Id.* at 536.)

In late 2016, Plaintiff returned to Spine Institute at least three times, complaining of 10/10 low back pain, as well as pain in his neck, left arm, bilateral shoulder, and bilateral leg. (doc. 16-1 at 771-75, 777-87.) Each time, he had 4/5 strength, decreased sensation to light touch in the bilateral upper extremities, increased sensation to the bilateral low extremities with tingling to light touch, and normal gait and station, but painful heel and toe walking. (*Id.* at 773-74, 779-81, 785-86.) At the first visit, he reported that Mobic provided little relief; he had negative bilateral straight leg raises and was not prescribed pain medication. (*Id.* at 774-75.) At the latter two visits, he had positive bilateral straight leg raises, and a C-spine ESI was recommended, but it was denied. (*Id.* at 774-75, 779, 782-83, 785.) In September 2016, Spinal Surgeon released him to work, but his work status report limited Plaintiff to a 6 to 8-hour workday, during which he could stand 1 hour, sit 4 to 6 hours, walk 1 hour, push/pull 1 hour, and lift/carry 5 to 10 pounds for 1 to 2 hours. (*Id.* at 776.)[3] His restrictions remained the same in October 2016. (*Id.* at 723.)

Plaintiff also visited PrimaCare three times for pain that occurred "all the time" from "head … to toes" and that "[wa]s no better". (*Id.* at 699-704, 706-09, 712-15.) Each time, he had tenderness to palpation throughout his spine and shoulders with moderately reduced range of motion, except he had only mildly reduced range of motion in his C-spine in November 2016. (*Id.* at 701, 708, 714.) He was diagnosed with chronic cervical pain, chronic thoracic back pain, and chronic bilateral low back pain with bilateral sciatica, and occasional "other chronic pain" and

---

[3] The record included a second work status report by Spinal Surgeon, also dated September 7, 2016, providing different restrictions, e.g., 6-hour workday, during which he could stand 4 hours, sit 6 hours, walk 6 hours, and push/pull 1 hour, but he had no lift/carry weight restrictions. (doc. 16-1 at 721.)

lumbago with sciatica on the right side. (*Id.* at 702, 708, 714.) In November 2016, he reported that

he still had medication and experienced no side effects. (*Id.* at 712.) Nurse Practitioner's

September 2016 and October 2016 work status reports specifically affirmed Spinal Surgeon's

advised work restrictions, but her November 2016 report limited Plaintiff to standing 4 hours,

walking 4 hours, sitting 8 hours, and lifting/carrying 15 pounds. (doc. 16-2 at 281, 287, 293.)

On November 21, 2016, R. David Bauer, M.D. (Orthopedist), completed a one-time

medical examination. (*Id.* at 155-73.) Plaintiff did not shift in his seat or show other "pain

behaviors", he had normal gait, and he used no aids or braces. (*Id.* at 165.) He endorsed severe

back pain, but he had negative bilateral straight leg raises and normal heel and toe walking. (*Id.* at

167-68.) The extent of his 2014 injuries were found to include at most C-spine strain because any

other spine condition due to his work injury was physiologically "not probable". (*Id.* at 169-70.)

On December 14, 2016, Michael Adair, D.C. (Treating Chiropractor) completed an initial

evaluation. (*Id.* at 317.) Plaintiff endorsed severe symptoms, including numbness in his legs and

spasms in his C-spine and T-spine. (*Id.*) He was referred for a physical therapy evaluation, physical

performance evaluation, and a psychological evaluation. (*Id.*) A work status report restricted him

from returning to work due to "severe injuries to the back of neck". (doc. 16-1 at 648.)

On December 20, 2016, Plaintiff underwent a physical therapy evaluation. (doc. 16-2 at

91-92.) He had tenderness to palpation and a reduced range of the spine, and his gait was normal

with decreased reflexes at 1+ to C5-C7 and L4-S1. (*Id.* at 91.) He had 5/5 muscle strength, no

muscle spasms were palpated, and he had intact sensation to pinwheel testing. (*Id.*) His medication

provided relief "somewhat". (*Id.*) Physical therapy was recommended to help his pain, limitations,

and impairments. (*Id.* at 92.)

On December 21, 2016, Treating Chiropractor completed a physical performance

evaluation (PPE) based on an in-person examination. (*Id.* at 93-95.) Plaintiff had normal standing

and ambulation, but motor weakness prevented him from tandem walking or performing a full

squat. (*Id.* at 93.) His grip strength was 15 pounds bilaterally, and he had reduced range of motion

in his shoulders, C-spine, and T-spine. (*Id.* at 94.) He could lift 12 pounds from waist to shoulder

occasionally and 6 pounds frequently, push 10 pounds occasionally and 5 pounds frequently, pull

20 pounds occasionally and 10 pounds frequently, and occasionally balance, sit, stand, walk, and

lie in a supine, prone, or in a side position, but he could never bend/stoop, squat, climb, kneel, or

reach above his shoulders. (*Id.*) He was capable of a physical demand level of "light", as defined

by the U.S. Department of Labor Physical Demand Characteristics of Work.[4] (*Id.* at 95.) The

following was observed:

1. [Plaintiff] has not lifted to the capacity required of his job; and/or he struggles with necessary positional tolerances necessary for working full-duty. …
2. [He] shows continued impairments with basic activities of daily living including[] lifting, carrying, reaching and squeezing.
3. Supervision and expertise by healthcare personnel is necessary for progression to optimal functioning.
4. [He] shows evidence of pain and joint motion restrictions.
5. A self-directed home exercise program may be beneficial for [him].

(*Id.*)

On January 17, 2017, Richard D. Palmer, M.D. (Third Examiner) completed a designated

doctor examination; he found that Plaintiff was uncooperative and that the testing was unreliable.

(*Id.* at 142-52.) He diagnosed him with cervical and lumbar sprain/strain with no radiculopathy,

---

[4] The Physical Demand Characteristics of Work chart of the U.S. Department of Labor provides that the occupational requirements of "light work" requires exerting up to 20 pounds of force occasionally (i.e., up to 1/3 of the time), and/or up to 10 pounds of force frequently (i.e., from 1/3 to 2/3 of the time), and/or a negligible (i.e., weighing less than 1 pound) amount of force constantly (i.e., 2/3 or more of the time) to move objects. U.S. Bureau of Labor Statistics, *Strength Levels*, BLS.gov, www.bls.gov/ors/factsheet/pdf/strength.pdf (last visited Apr. 17, 2023). It also provides that a job should be rated light work if the sedentary lifting or carrying requirements are met and more than 1/3 of the workday is spent standing or if the work level of an occupation does not meet the conditions for the other strength levels, including sedentary. *Id.*

and he opined that "initial" imaging "clearly" showed pre-existing conditions unrelated to Plaintiff's work injury. (*Id.* at 149-50.)

On February 7, 2017, the state agency medical consultant (SAMC) Scott Spoor, M.D., completed a medical evaluation of Plaintiff's evidence of record. (doc. 16-1 at 114-21.) He noted that Plaintiff alleged disability due to a head injury, rotator cuff injury, back problems, headaches, and numbness in his arms and legs. (*Id.* at 114-15.) He found that Plaintiff's dysfunction of the major joints and spine disorders was non-severe. (*Id.* at 119.) He opined that the medical records showed "significant" inconsistencies, Plaintiff's activities of daily living were not supported by the record, and his alleged limitations were not consistent with the objective medical and other evidence of record. (*Id.* at 119-20.) On May 18, 2017, SAMC Ronald Crow, D.O., expressly affirmed SAMC Spoor's findings. (*Id.* at 129.)

On February 15, 2017, Treating Chiropractor completed a second PPE summary report. (doc. 16-2 at 138-40.) Plaintiff had normal ambulation, but he could not tandem walk or fully squat. (*Id.* at 138.) His bilateral grip strength had increased to 20 pounds, his range of motion had improved slightly, and he could push, pull, and lift a greater weight from waist to shoulder. (*Id.* at 139.) He could lift and carry 5 to 17 pounds occasionally and 2 to 8 pounds frequently, and he could occasionally bend/stoop and squat, but not climb, kneel, crawl, or reach above his shoulders. (*Id.*) His activities of daily living had improved, and he was limited to "light" work as defined by the U.S. Department of Labor. (*Id.* at 140.)

On April 26, 2017, John E. Pearson, D.C. (Fourth Examiner) completed an impairment rating based on the evidence of record and an examination of Plaintiff. (*Id.* at 314-22.) He opined that Plaintiff's left rotator cuff tear, head injury, and cervical, thoracic, and right knee pain were related to his work injury, but his spondylolisthesis of L5/S1 was not work-related because it was

congenital, and there was no evidence of its aggravation. (*Id.* at 318-19.)

On June 2, 2017, Mark Parker, M.D. (Fifth Examiner), performed a designated doctor examination based on the evidence of record. (*Id.* at 497-501.) He noted that Plaintiff's first complaint of shoulder pain occurred 6 months after the work accident, his multiple electrodiagnostic examinations had not revealed lumbar or cervical radiculopathy, and he did not complain of knee injuries until several years after the work accident. (*Id.* at 500.) He concluded that Plaintiff did not have cervical or lumbar radiculopathy and that several diagnoses, including left shoulder rotator cuff tear, T-spine and C-spine herniated discs, and L5-S1 spondylolisthesis, were "ordinary disease[s] of life" and not related to his work accident. (*Id.* at 500.)

On July 7, 2017, Fourth Examiner completed an "alternative" impairment rating based on the evidence of record and an examination of Plaintiff; he found tenderness to palpation at T1-T7, L3-S1, and C3-C7, and reduced L-spine and T-spine range of motion. (*Id.* at 487-92.) His report contained a summary of Plaintiff's medical history:

> On 08/04/16 [Plaintiff] presented for a designated doctor examination performed by [Second Examiner] to determine MMI/IR [maximum medical improvement/impairment rating] and [extent of injury]. [He] was noted not to be at MMI, therefore an IR could not be determined. [Second Examiner] stated that the left rotator cuff, cervical spine HNP, thoracic spine HNP, head injury, and knee injury were to be deemed compensable.
>
> A functional capacity evaluation was performed on 08/11/16. [Plaintiff] did not complete the testing elements and the test was invalid due to his fear of worsening his condition.

(*Id.* at 488-89).

### 2. Psychiatric and Psychological Evidence

On November 11, 2014, the day of his work injury, Plaintiff denied feeling down, depressed, or hopeless in the prior two weeks, and he denied any current confusion, anxiety, depression, agitation, or any psychiatric problems. (doc. 16-1 at 595, 600-01.) He was alert, oriented times three, cooperative, attentive, and appropriate, and his memory was intact. (*Id.* at

596, 600-01.) The next day, he again denied any depression symptoms. (*Id.* at 611.) His speech was still coherent; he was still alert, cooperative, attentive, appropriate, oriented times three; and he was negative for anxiety, depression, or agitation. (*Id.* at 611-612.)

In late 2014 and early 2015, Concentra staff noted that Plaintiff denied any psychiatric symptoms and that he had normal mental status examinations. (*Id.* at 635, 646.)

At least 5 times in 2016, PrimaCare staff indicated that Plaintiff had normal insight and judgment and/or was oriented times four and showed appropriate mood and affect. (docs. 16-1 at 695, 701, 708, 714; 16-2 at 266-67, 270, 279, 285, 291.) In August 2016, Second Examiner noted that he was pleasant and cooperative but also in distress, and an ER record noted that he denied any self-harm or self-harm ideation. (docs. 16-1 at 666; 16-2 at 533.) From October 2016 to December 2016, Nurse Practitioner opined that Plaintiff demonstrated appropriate mood and affect, and Orthopedist found that he had appropriate affect and no depression or anxiety. (docs. 16-1 at 695, 701, 708; 16-2 at 165.) During this time, Spinal Surgeon noted that Plaintiff denied any negative psychiatric symptoms and/or that he was alert, oriented times three, and had appropriate affect. (docs. 16-1 at 725, 728-29, 736, 744, 754-56, 763, 784, 791, 797; 16-2 at 40.)

On February 13, 2017, licensed psychological associate Veronica Irvine, M.A., L.P.A. (First Psychological Associate)[5], completed an initial behavioral medicine assessment, co-signed by Nicole Mangum, Ph.D. (Psychologist), upon referral by Treating Chiropractor "to assess

---

[5] In Texas, there are three types of licenses for the practice of psychology, including a licensed psychological associate. Texas Behavioral Health Executive Council, *Applying for a License*, BHEC.Texas.gov, www.bhec.texas.gov/texas-state-board-of-examiners-of-psychologists/applying-for-a-license/index.html (last visited May 24, 2023). The requirements for obtaining licensure as a psychological associate include a graduate degree in psychology, demonstrated proof of graduate level coursework, 6 semester credit hours of practicum, internship, or other structured experience within the graduate degree program while under the supervision of a licensed psychologist, and passage of the Examination for Professional Practice in Psychology and the Jurisprudence Examination. *Id.* (citing 22 T.A.C. § 463.8). Barring the completion of additional requirements, a licensed psychological associate "must practice under the supervision of a licensed psychologist and may not practice independently." 22 T.A.C. § 463.8(c)(1).

[Plaintiff's] emotional status and to determine [its] relationship to the work accident".[6] (doc. 16-2 at 98-104.) It was based on the evidence of record, a clinical interview, a mental status examination, and behavioral observations. (*Id.*) His Beck Depression Inventory-II score of 22 indicated moderate depression, and his CNS Vital Signs test scores ranged from above average (executive function and cognitive flexibility, 96th percentile), to low (psychomotor speed, 7th percentile; motor speed, 3rd percentile), to very low (simple attention, 1st percentile). (*Id.* at 102, 104.) He was diagnosed with major depression disorder and mild neurocognitive disorder due to traumatic brain injury. (*Id.* at 103.) He was advised to begin taking medication for his depression, anxiety, and sleep issues, to enroll in a course of cognitive behavioral therapy, and to undergo a neuropsychological evaluation "for his cognitive deficits". (*Id.* at 103-04.)

Upon referral by Treating Chiropractor, Claudia Espinosa, M.A., L.P.A. (Second Psychological Associate) and Psychologist completed a neuropsychological evaluation based on a clinical interview, self-reports, and numerous tests on May 22, 2017, "to determine [Plaintiff's] current neuropsychological functioning". (*Id.* at 509-23.)[7] His decreased Beck's score indicated "minimal" depression. (*Id.* at 516.) His IQ score of 75 was in the borderline range, and his WAIS-IV scores ranged from low average (perceptual organizational index score: 86; working index score: 80; processing speed index score: 89) to extremely low (verbal comprehension index score: 68). (*Id.*) He "had trouble with initiation, shift set, and sustained attention"; might have difficulty with completing tasks, thinking things through, or following new instructions that required "significant functional memory" or "high demands of … concentration"; and might need help

---

[6] The assessment identified First Psychological Associate as the "Examiner" and Psychologist as the "Clinical Supervisor". (doc. 16-2 at 98.)

[7] The evaluation identified Second Psychological Associate as a "LICENSED PSYCHOLOGICAL Associate" and Psychologist as a "NEUROPSYCHOLOGIST". (doc. 16-2 at 509) (capitalization in original).

interacting with coworkers or the public. (*Id.* at 515, 518, 520-21.) It was noted that individuals at his performance level usually performed semi-skilled or unskilled jobs. (*Id.* at 520.) He was diagnosed with mild neurocognitive disorder due to traumatic brain injury, and a neurocognitive program was recommended. (*Id.* at 521.)

On June 2, 2017, Fifth Examiner performed a designated doctor examination based on the record, and he found evidence of traumatic brain injury and neurocognitive disorder but not major depressive disorder. (*Id.* at 500-01) ("I do not see this specific diagnosis made and therefore cannot say that in my opinion this would be related to the work incident."). On July 7, 2017, Fourth Examiner completed an alternative impairment rating based on Plaintiff's records, and he found evidence of neurocognitive disorder and traumatic brain injury relating to the 2014 work injury. (*Id.* at 486-92.)

## C.  <u>February 4, 2021 Hearing</u>[8]

On February 4, 2021, Plaintiff testified at a hearing before the ALJ. (doc. 16-1 at 79-102.) He was represented by an attorney. (*Id.*)

Plaintiff had a driver's license and could drive, but he had to take breaks when his legs and both his arms went numb. (*Id.* at 84-85.) At the time he was not taking any prescription medication for any mental health problems. (*Id.* at 88.) A therapist had reached out to him a "couple" times; he had "seldom" met with them because of the pandemic. (*Id.*) He would get depressed, and he became homeless when his worker's compensation benefits were terminated. (*Id.*)[9]

---

[8] Plaintiff and a VE had appeared and testified at a prior hearing on April 2, 2018. (doc. 16-1 at 49-76.)

[9] Plaintiff's alleged depression was discussed at the administrative hearing:

ALJ:        There's some indication of depression in the file. Counsellor, are you alleging that depression's a severe MD[I] [medically determinable impairment]?

Attorney:   I mean, I can obviously [see] to some degree but there wasn't a lot of development in that

**D.  March 1, 2022 Hearing**

On March 1, 2022, an impartial VE testified at a hearing before the ALJ. (*Id.* at 105-113.) Plaintiff appeared and was represented by an attorney, but he did not testify. (*Id.*)

The VE considered a hypothetical individual with Plaintiff's age, education, and past work experience who could perform light work, except he had a sit-stand option as well as reaching and postural limitations. (*Id.* at 110.) The individual could not perform past work, but he could perform unskilled, light work as a photocopy machine operator (DOT[10] 207.685-014, SVP-2), with 66,000 jobs nationally; laundry classifier (DOT 361.687-014, SVP-2), with 70,000 jobs nationally; and mail clerk (DOT 209.687-026, SVP-2), with 99,000 jobs nationally (*Id.* at 111.) A hypothetical individual limited to sedentary work could perform no jobs. (*Id.*)

His testimony was consistent with the DOT, except as to overhead reaching, which the DOT did not address and was instead based on his education and work experience. (*Id.* at 111-12.)

**E.  ALJ's Findings**

The ALJ issued an unfavorable decision on March 29, 2022. (*Id.* at 22-35.) At step one, he found that Plaintiff had not engaged in substantial gainful activity between his amended alleged onset date of June 19, 2015, through his DLI of December 31, 2016. (*Id.* at 24.) At step two, he found that Plaintiff had the severe impairments of cervical disc displacement, degenerative disc disease of the lumbar spine, left shoulder impingement, and right knee meniscus tear. (*Id.*) He also found that there was "no definite diagnosis" of depression and that there was "no evidence of a medically determinable mental impairment prior to the expiration of the [DLI]". (*Id.* at 28.) At

---

particular area. But I do believe that if nothing else, the pain alone would be sufficient to affect his attention and concentration, Your Honor.

(doc. 16-1 at 88.)

[10] DOT stands for Dictionary of Occupational Titles; SVP stands for Specific Vocational Preparation.

step three, the ALJ concluded that Plaintiff's impairments did not singularly or in combination

meet or medically equal the required criteria for any of the listed impairments in 20 C.F.R. § 404,

Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525-404.1526.) (*Id.* at 29.) He expressly

considered Listings 1.02 and 1.04. (*Id.*)

Next, the ALJ determined that Plaintiff retained the physical residual functional capacity

(RFC) to perform light work[11] with the following limitations:

> He should be able to alternate between sitting and standing at will without leaving the
> workstation or going off task. He is limited to occasional reaching overhead bilaterally,
> and frequent reaching in all other directions bilaterally. He can occasionally climb ramps
> and stairs, balance, stoop, kneel, crouch, and crawl, but can never climb ladders, ropes, and
> scaffolds.

(*Id.* at 29-30.) Based on the VE's testimony, he found at step four that Plaintiff could not perform

his past work. (*Id.* at 33.) At step five, he found that transferability of job skills was not material

to the determination of disability because the Medical-Vocational Rules supported a finding that

Plaintiff was not disabled regardless of whether he had transferable job skills, but considering his

age, education, work experience, and RFC, there were jobs that existed in significant numbers in

the national economy that he could perform. (*Id.* at 34-35.) The ALJ determined that Plaintiff had

not been under a disability, as defined by the Social Security Act, at any time from the amended

alleged onset date of June 19, 2015, through his DLI. (*Id.* at 35.)

## II.    STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the

Commissioner's position is supported by substantial evidence and whether the Commissioner

---

[11] The ALJ's finding that Plaintiff had the RFC to lift and/or carry 20 pounds occasionally and 10 pounds frequently (push and/or pull is unlimited except for lift/carry restrictions), walk and/or stand 6 hours in an 8-hour workday, and sit for 6 hours in an 8-hour workday, meets the Social Security Administration's definition of light work. (doc. 16-1 at 29-30); *see* 20 C.F.R. § 404.1567(b).

applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v.*

*Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.    ISSUES FOR REVIEW

Plaintiff presents four issues for review:

1.  Remand is required because the Administrative Law Judge (ALJ) failed to evaluate three medical opinions of record, all of which agreed that [Plaintiff] was limited to a range of sedentary work.

2.  Remand is required because the ALJ erred in finding that [Plaintiff]'s depression was not a medically determinable impairment and failing to even evaluate his cognitive disorder that resulted from a traumatic brain injury.

3.  Remand for an award of benefits is warranted because there has been extraordinary delay in this case due to [the Social Security Administration]'s actions and the medical evidence of record demonstrates that [Plaintiff] could perform less than a full range of sedentary work and is therefore disabled pursuant to the medical-vocational guidelines (grids.)

4.  Remand is required because the ALJ and Appeals Council members were not properly appointed.

(doc. 19 at 1.)

### A.  Medical Opinion Evidence

Plaintiff argues that the ALJ failed to consider three medical opinions. (doc. 19 at 7-9.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. § 404.1529(b). Every medical opinion is evaluated regardless of its source (i.e., treating or nontreating), but the Commissioner generally gives greater weight to medical opinions from a treating source.[12] 20 C.F.R. § 404.1527(a), (c). A treating source is a claimant's "own acceptable medical source who provides [him], or has provided [him], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with

---

[12] On January 18, 2017, the Social Security Administration updated the rules on the evaluation of medical evidence. *See* 82 Fed. Reg. 5844, 5853 (Jan. 18, 2017). For claims filed on or after March 27, 2017, the rule that treating sources be given controlling weight was eliminated. *See Winston v. Berryhill*, 755 F. App'x 395, 402 n.4 (5th Cir. 2018) (citing 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)"). Because Plaintiff filed his application before the effective date, the pre-2017 regulations apply.

[him]." 20 C.F.R. § 404.1527(a)(2). When a treating source's medical opinion "on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give it controlling weight. 20 C.F.R. § 404.1527(c)(2). If controlling weight is not given to a treating source's medical opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the medical opinion; (4) the consistency of the medical opinion with the record as a whole; (5) whether the medical opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict" the medical opinion. 20 C.F.R. § 404.1527(c)(1)-(6).

While an ALJ should afford considerable weight to the medical opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with him. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). The ALJ is "free to reject the opinion of any [treating] physician when the evidence supports a contrary conclusion." *Oldham v. Schweiker*, 660 F.2d 1078, 1086 (5th Cir. 1981) (noting that "the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician" but holding that "because the opinion of the [non-examining] physician is supported by the evidence, the district court was entitled to accept [it] and reject the conclusory opinion of Dr. Harris, one of claimant's treating physicians"); *see Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987) (quoting *Oldham* to "conclude that the ALJ was free to reject [treating physician]'s conclusions in favor of those of [examining physician]"). A treating physician's medical opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence

is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Newton*, 209 F.3d at 455-56. Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453. A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.

Here, the ALJ determined that Plaintiff's RFC amounted to light work with some non-exertional and postural limitations and a sit-stand option. (doc. 16-1 at 29-30); *see* 20 C.F.R. § 404.1567(b). In making his RFC determination, the ALJ relied primarily on Treating Chiropractor's December 2016 PPE summary report that limited Plaintiff to a reduced range of light work, though the ALJ gave it "partial weight" because the report lacked support and was "not wholly consistent with the medical record and [his] own treatment records".[13] (*See* docs. 16-1 at 29-30, 33; 16-2 at 93-95.)

---

[13] As noted, Treating Chiropractor's PPE summary report found that Plaintiff could, among other things, "push 10 pounds occasionally and 5 pounds frequently; pull 20 pounds occasionally and 10 pounds frequently; carry 12 pounds occasionally and 6 pounds frequently", and perform "observational sitting, observational standing and observational walking", and he concluded that Plaintiff was capable of light work as defined by the Department of Labor, which mirrors the weight restrictions of the Social Security regulations' definition of light work. (doc. 16-2 at 93, 95); *compare* Dep't of Labor, *Physical Demand Definitions for the OWCP* 2, DOL.gov, www.dol.gov/sites/dol gov/files/owcp/dfec/regs/compliance/owcp-5c.pdf (last visited May 28, 2023) ("Light Work involves exerting up to 20 pounds of force occasionally or up to 10 pounds of force frequently, or a negligible amount of force constantly to move objects."), *with* 20 C.F.R. § 404.1567(b) (providing that light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds").

### 1. *Nurse Practitioner and Second Examiner*

Plaintiff argues that the ALJ failed to give "significant weight" to the opinions of Second Examiner and Nurse Practitioner, as his "treating" providers. (doc. 19 at 8-9.) Alternatively, "[e]ven if [they] [were] not entitled to weight as … acceptable medical source opinion[s]", he argues, the ALJ could not "ignore [them] entirely". (*Id.* at 9.)

Social Security Ruling (SSR) 06-03p provides that "all relevant evidence in the case record" is considered when making a determination or decision about whether an individual is disabled. SSR 06-03p, 2006 WL 2329939, at *4 (S.S.A. 2006) ("[T]he Act requires us to consider all of the available evidence in the individual's case record in every case.").[14] Such evidence includes medical sources who are not "acceptable medical sources". *Id.* SSR 06-03p distinguishes between evidence from "acceptable medical sources" (e.g., physicians, psychologists) and evidence from "other sources" (i.e., non-medical sources and medical sources, such as chiropractors, nurse practitioners). *See* 2006 WL 2329939, at *2. The ALJ "should" compare opinions of other sources "against the available medical opinion evidence". *See Ihde v. Colvin*, 270 F. Supp. 3d 956, 962 (W.D. Tex. Sept. 6, 2017) (citing SSR 06-03p, 2006 WL 2329939, at *4). In evaluating the opinions of other sources, the ALJ should consider the six factors under 20 C.F.R. § 404.1527(c). *Id.* at 962-63.[15]

---

[14] On March 27, 2017, the Social Security Administration rescinded SSR 06-03p for all claims brought on or after that date. *See* Rescission of Social Security Rulings 96-2p, 96-5p, and 06-3p, 2017 WL 1105348 (Mar. 27, 2017). Because Plaintiff filed his application before the effective date, this ruling applies.

[15] SSR 06-03p phrases the factors under 20 C.F.R. § 404.1527(c) slightly differently:

[1] How long the source has known and how frequently the source has seen the individual; [2] How consistent the opinion is with other evidence; [3] The degree to which the source presents relevant evidence to support an opinion; [4] How well the source explains the opinion; [5] Whether the source has a specialty or area of expertise related to the individual's impairment(s); and [6] Any other factors that tend to support or refute the opinion.

*Ihde*, 270 F. Supp. 3d at 961 (citing SSR 06-03p, 2006 WL 2329939, at *4-5).

While the ALJ is not required to consider "every" factor when discussing evidence from other sources, he "should examine th[e] factors applicable to the particular circumstances of a given case" and "should sufficiently discuss [them] to establish why he rejected opinion evidence". *Id.* at 963 (citing SSR 06-03p, 2006 WL 2329939, at *5; *Adkins v. Berryhill*, No. 3:16-CV-000459-RFC, 2017 WL 1185235, at *7-8 (W.D. Tex. Mar. 29, 2017) (holding that the ALJ's consideration of nurse practitioner's medical source statement under two factors was sufficient); *Mitchell v. Astrue*, No. SA-11-CA-0751-XR, 2012 WL 2368508, at *9 (W.D. Tex. June 21, 2012) (holding that the ALJ's consideration of licensed professional counselor's assessment under four factors was sufficient)). Importantly, the ALJ's decision "cannot be 'devoid of any degree of specific consideration' of the opinion evidence". *Ihde*, 270 F. Supp. 3d at 963 (quoting *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007)).

### a. Nurse Practitioner

Here, from July 2016 to November 2016, Nurse Practitioner treated Plaintiff at least 4 times for chronic cervical pain, chronic thoracic back pain, and chronic bilateral low back pain with bilateral sciatica. (doc. 16-1 at 693-96, 699-704, 706-09, 712-15.) She signed his treatment notes, examined him, and noted his medications. (*Id.*) Nurse Practitioner also completed 3 work status reports releasing him to return to work with some restrictions. (doc. 16-2 at 281, 287, 293.) Her September 2016 work status report limited him to a 6-hour workday, and to stand 4 hours, walk 6 hours, sit 6 hours, and push/pull 1 hour, which amounts to less than full-time light work. (*Id.* at 281); *see* 20 C.F.R. § 404.1567(b); SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). Her October 2016 work status report limited him to a 6 to 8-hour workday and to stand 1 hour, walk 1 hour, sit 4 to 6 hours, and lift/carry 5 to 10 pounds for 2 hours, i.e., less than full-time sedentary work. (doc. 16-2 at 287); *see* 20 C.F.R. § 404.1567(a); SSR 96-8p, 1996 WL 374184, at *1. Her

November 2016 work status report limited him to stand 4 hours, walk 4 hours, sit 8 hours, and lift/carry 15 pounds, preventing him from meeting the weight restriction of light work. (doc. 16-2 at 293); *see* 20 C.F.R. § 404.1567(b). The ALJ's decision discussed some of Nurse Practitioner's treatment notes and cited all her work status reports, but it did not discuss the 3 work status reports permitting Plaintiff to work with specific vocational restrictions. (docs. 16-1 at 22-35; 16-2 at 281, 287, 293.)

Under the pre-2017 regulations, Nurse Practitioner is not an acceptable medical source, so she cannot be a treating source, and her opinions are not entitled to controlling weight or to the ALJ's consideration. *See* 20 C.F.R. § 404.1527(f); *see Ihde*, 270 F. Supp. 3d at 962 (considering nurse practitioner as a non-acceptable medical source). Accordingly, the ALJ was not required to consider her work status reports. (doc. 16-1 at 44); *see Ihde*, 270 F. Supp. 3d at 962 (noting the "preference", not "requirement", for the ALJ to explain his reasoning for giving greater weight to the medical opinion evidence of an acceptable medical source than the opinion evidence of other sources). Nevertheless, the ALJ did cite her 3 work status reports, but he implicitly rejected them by finding that they failed to provide "specific vocational restrictions". (doc. 16-1 at 32-33.) Nurse Practitioner's 3 work status reports did provide vocational restrictions, including capping his work hours to less than 8 hours per workday and/or limiting his weight restriction to 15 pounds, contradicting the ALJ's light work RFC. (*Compare id.*, *with* doc. 16-2 at 281, 287, 293); *see* 20 C.F.R. § 404.1567(b) (defining light work). Although the ALJ was not required to weigh Nurse Practitioner's work status reports, his broad rejection of them due to an inaccuracy, at a minimum, "cast[s] into doubt the existence of substantial evidence to support [his] decision", *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988), which "must stand or fall with the reasons set forth in [it], as adopted by the Appeals Council", *Newton*, 209 F.3d at 455.

### b. Second Examiner

Here, Second Examiner examined Plaintiff in-person and reviewed his medical records, on which she based a September 2016 work status report. (doc. 16-1 at 655, 658-74.) Her evaluation indicated he had partial tear of left rotator cuff, HNP at C-spine and T-spine, head injury, and left shoulder soft tissue injury. (*Id.* at 671-73.) Her work status report stated he could return to work but limited him to lifting and/or carrying 15 pounds for 2 hours per workday, which is inconsistent with the 20-pound weight limitations of light work. (*Id.* at 655); *see* 20 C.F.R. § 404.1567(b).

Second Examiner, who is a chiropractor, is not an acceptable medical source. *See Porter v. Barnhart*, 200 F. App'x 317, 319 (5th Cir. 2006) (unpublished) (finding that a chiropractor is not listed as an acceptable medical source). She is instead, like Nurse Practitioner, an "other source", and her work status report, reflecting her judgment about Plaintiff's exertional abilities, is an opinion under the regulations and is not entitled to controlling weight. (doc. 16-1 at 655); *see* 20 C.F.R. § 404.1527(f). Nevertheless, the ALJ *did* consider Second Examiner's opinion. (doc. 16-1 at 27-28.) He discussed her doctor designated evaluation and work status report, and then he noted that Fourth Examiner had found that her "testing" was "invalid" because Plaintiff "did not perform some elements of testing due to fears of worsening his condition". (*See* docs. 16-1 at 28; 16-2 at 316.) While the ALJ did not explicitly reject Second Examiner's work status report, he appears to implicitly reject it and/or her doctor designated evaluation as "invalid". (*Id.*) Fourth Examiner's finding pertains to a functional capacity evaluation by an unknown provider on August 11, 2016, and not to Second Examiner's designated doctor evaluation dated August 4, 2016, however. (*Compare* doc. 16-1 at 27-28, *with* doc. 16-2 at 316.) Accordingly, the ALJ's rejection of Second Examiner's work status report appears to be based on an inaccuracy. *See Ihde*, 270 F. Supp. 3d at 965 (noting the ALJ's "inaccurate" citation of Dr. Cessna's medical opinion in the

decision and the absence of any analysis of the weight factors in the ALJ's "brief" discussion of the opinion evidence making the ALJ's weight determination "opaque at best" and unsupported by substantial evidence); *see also Dougherty v. Astrue*, 715 F. Supp. 2d 572, 583 (D. Del. May 7, 2010) (stating that "the court is not convinced that the ALJ accurately characterized Dougherty's activities of daily living when he cited such as a basis for rejecting Dr. Gossinger's opinion"); *Macaulay v. Astrue*, 262 F.R.D. 381, 391 (D. Vt. Apr. 27, 2009) (finding that the ALJ's findings, including "misstate[ments]" about Dr. Borie's medical source statement, were "flawed" and not supported by substantial evidence).

By mistakenly attributing Fourth Examiner's statements about another provider's evaluation to Second Examiner's opinions and by rejecting her work status report despite its specific vocational restrictions, the ALJ failed to "otherwise ensure" that his discussion of the evidence could be reviewed under 20 C.F.R. § 404.1527(f)(2). His mistakes, at a minimum, "cast into doubt the existence of substantial evidence to support [his] decision", *Morris*, 864 F.2d at 335, which "must stand or fall with the reasons set forth in [it], as adopted by the Appeals Council", *Newton*, 209 F.3d at 455.

### 2. *Spinal Surgeon*

Plaintiff contends that the ALJ failed to consider the last two work status reports of Spinal Surgeon, whose opinion "was entitled to significant deference". (doc. 19 at 8-10.)

Here, Spinal Surgeon treated Plaintiff at least 10 times from May 2015 to December 2016 for partial tear of rotator cuff, HNP at C-spine, lumbar sprain, lumbar radiculopathy, thoracic sprain, cervical strain, and spondylolisthesis. (doc. 16-1 at 725-27, 728-38, 743-47, 750-60, 762-69, 771-75, 777-87.) From May 2015 to July 2016, he restricted Plaintiff from returning to work 6 times. (docs. 16-1 at 740, 770; 16-2 at 1, 9-10, 19, 28.) His September 2016 and October 2016

status reports approved his return to work but limited him to a 6 to 8-hour workday and to stand 1 hour, walk 1 hour, sit 4 to 6 hours, and lift/carry 5 to 10 pounds for 1 to 2 hours, which amounts to a reduced range of sedentary work. (doc. 16-1 at 723, 776); *see* 20 C.F.R. § 404.1567(a) (stating that sedentary work involves "lifting no more than 10 pounds at a time").[16]

Although the ALJ's narrative discussion mentioned Spinal Surgeon's treatment notes, and he specifically rejected Spinal Surgeon's work status reports that restricted Plaintiff from returning to work but lacked specific vocational restrictions, he implicitly rejected Spinal Surgeon's last 2 work status reports that did include specific vocational restrictions. (doc. 16-1 at 22-35, 723, 776.)

Spinal Surgeon, as a physician who had an ongoing relationship with Plaintiff and rendered medical treatment and evaluation, is a treating physician under the regulations. (docs. 19 at 7-8; 20 at 7); *see* 20 C.F.R. § 404.1527(a)(2). Even if the ALJ relied on Treating Chiropractor's PPE summary report that Plaintiff could perform light exertional work, he was still required to explain his reasons for implicitly rejecting Spinal Surgeon's last two work status reports. *See Kneeland v. Berryhill*, 850 F.3d 749, 760 (5th Cir. 2017) ("And fundamentally, '[t]he ALJ cannot reject a medical opinion without an explanation.'"); *Abadie v. Barnhart*, 200 F. App'x 297, 298 (5th Cir. 2006) (holding that the "ALJ was not required to accept [the treating source's] opinions, but was required to consider them, and if he chose to reject them, to explain what conflicting evidence informed his choice"); *Knox v. Astrue*, 660 F. Supp. 2d 790, 812 (S.D. Tex. Sept. 29, 2009) ("If the ALJ believed that Dr. Farag's opinion should not be given controlling weight, he must properly

---

[16] A duplicate September 2016 work status report by Spinal Surgeon limited him to a 6-hour workday and to stand 4 hours, walk 6 hours, sit 6 hours, and push/pull 1 hour, which amounts to less than light work. (doc. 16-1 at 721); *see* 20 C.F.R. § 404.1567(b) (stating that light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and "requires a good deal of walking or standing, or … sitting most of the time with some pushing and pulling of arm or leg controls"); *see also* SSR 96-8p, 1996 WL 374184, at *1 ("Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis", i.e., a "8 hours a day, for 5 days a week, or an equivalent work schedule.").

explain the reason for doing so."); *Gomez v. Barnhart*, No. SA-03-CA-1285-XR, 2004 WL 2512801, at *2 (W.D. Tex. Nov. 5, 2004) ("[A]n ALJ who rejects the opinion of a treating physician must explain his reasons for doing so."). Because he ignored Spinal Surgeon's September 2016 and October 2016 work status reports without good cause, the ALJ committed legal error.

### 3. *Harmless Error*

Having found error, the Court must still consider whether the ALJ's failure to address or properly evaluate the opinions of Spinal Surgeon, Second Examiner, and Nurse Practitioner was harmless. *See Kneeland*, 850 F.3d at 761-62 (applying harmless error analysis where the ALJ failed to address or evaluate an examining physician's opinion); *McNeal v. Colvin*, 3:11-CV-02612-BH-L, 2013 WL 1285472, at *27 (N.D. Tex. Mar. 28, 2013) (applying harmless error analysis to the ALJ's failure to properly evaluate treating opinion under 20 C.F.R. § 404.1527(c)); *Hawley v. Saul*, No. 3:19-CV-1959-BH, 2020 WL 6545912, at *9 (N.D. Tex. Nov. 6, 2020) (applying harmless error analysis where the ALJ failed to address an opinion based on testing outside the relevant period).

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party are affected." *Mays v. Bowen*, 837 F.2d 1362, 1363-64 (5th Cir. 1988). "[E]rrors are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision." *Morris*, 864 F.2d at 335. In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. Nov. 28, 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)). Accordingly, to establish prejudice that warrants

remand, Plaintiff must show that the ALJ's decision might have been different had he properly considered Spinal Surgeon's September 2016[17] and October 2016 work status reports, Second Examiner's September 2016 work status report, and Nurse Practitioner's work status reports from September 2016 through November 2016. *See id.* at 816 (citing *Newton*, 209 F.3d at 458).

As noted, Spinal Surgeon's September 2016 and October 2016 work status reports limited Plaintiff to a reduced range of sedentary work; Second Examiner's work status report limited Plaintiff to lifting and/or carrying 15 pounds for 2 hours per workday; and Nurse Practitioner's work status reports from September 2016 through November 2016 prevented Plaintiff from performing the light work weight restriction or from full-time work. (doc. 16-1 at 281, 287, 293, 655, 723, 776.) These reports contradict, or at a minimum, cast into doubt, the ALJ's physical RFC finding that Plaintiff could perform a reduced range of light work. (*Compare id.*, *with id.* at 29-30.) The ALJ did not consider these opinions and/or rejected them based on an inaccurate finding. (*Compare id.* at 287, 293, 655, 723, 776, *with id.* at 22-35.) "[S]uch an error makes it impossible to know whether the ALJ properly considered and weighed an opinion, which directly affects the RFC determination." *Kneeland*, 850 F.3d at 762.

It is not inconceivable that the ALJ would have reached a different conclusion had he considered Spinal Surgeon's medical opinion regarding Plaintiff's limitations under 20 C.F.R. § 404.1527(c), or Second Examiner and Nurse Practitioner's respective opinions under § 404.1527(f). *See Kneeland*, 850 F.3d at 762 ("[I]f [examiner]'s opinion was afforded some weight, the ALJ's RFC would surely have been different."); *Hawley*, 2020 WL 6545912, at *10 ("It is not inconceivable that the ALJ would have reached a different conclusion had he considered

---

[17] As noted, there were two September 2016 work status reports—one limiting him to sedentary work and another limiting him to less than light work. (*Compare* doc. 16-1 at 721, *with id.* at 776.)

Dr. Chen's [post-DLI medical] opinions."); *McNeal*, 2013 WL 1285472, at *28 ("Alternatively, if the ALJ had considered and accepted Dr. Rao's mental RFC questionnaire, the ALJ might have imposed greater restrictions on Plaintiff's mental RFC."). Contrary to the Commissioner's argument that any error was harmless because Plaintiff was limited to light work at the unskilled level, the ALJ could have found additional physical limitations or any mental limitation that would have affected his RFC determination and/or that precluded Plaintiff from the jobs the VE identified. (*See* doc. 20 at 10.) "This in turn, would likely have affected the jobs available at step five of the sequential evaluation process, and [Plaintiff] may have been found disabled." *Kneeland*, 850 F.3d at 762; *see McAnear v. Colvin*, No. 3:13-CV-4985-BF, 2015 WL 1378728 at *5 (N.D. Tex. Mar. 26, 2015) ("Had the ALJ tracked this more restricted RFC in her hypothetical to the VE, a different conclusion might have been reached regarding Plaintiff's ability to perform the jobs of cleaner/housekeeper/house-cleaner, marker, and power screwdriver operator.").

The ALJ's error was not harmless because it is not inconceivable that he would have reached a different decision had he considered the opinions of Spinal Surgeon, Second Examiner, and Nurse Practitioner. *See Kneeland*, 850 F.3d at 761-62 (finding that the error was not harmless where the ALJ failed to address or properly consider a medical opinion); *see also Singleton v. Astrue*, No. 3:11-CV-2332-BN, 2013 WL 460066, at *6 (N.D. Tex. Feb. 7, 2013) (finding the ALJ's failure to consider a medical source opinion was not harmless error because the court could not say what the ALJ would have done had he considered the opinion, and had he considered the opinion he might have reached a different decision). Accordingly, the errors are not harmless, and remand is required on this issue.

## B. **Mental Impairments**

Plaintiff argues that the ALJ "committed significant legal error in evaluating the evidence

related to [his] mental impairments". (doc. 19 at 10.) He relies on the medical opinions of his mental health providers. (*Id.*)

Claimants are "eligible for benefits only if the onset of the qualifying medical impairment began on or before the date the claimant was last insured." *Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5th Cir. 1990) (citing POMS § DI 25501.050(B)(1)). They "bear the burden of establishing a disabling condition before the expiration of their insured status." *Id.* (citing *Milam v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)). They must also present "objective medical evidence of a condition that reasonably could be expected to produce the level of pain alleged." *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989) (citing *Owens v. Heckler*, 770 F.2d 1276, 1281 (5th Cir. 1985); *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988); *Parfait v. Bowen*, 803 F.2d 810, 813 (5th Cir. 1986)).

"Evidence showing the degeneration of a claimant's condition after the [DLI] is not relevant to the Commissioner's ... analysis." *McLendon v. Barnhart*, 184 F. App'x 430, 432 (5th Cir. 2006) (citing *Torres v. Shalala*, 48 F.3d 887, 894 n. 12 (5th Cir. 1995)). Nevertheless, the Fifth Circuit has held that "[s]ubsequent" medical evidence, i.e., post-DLI evidence, "is relevant ... because it may bear upon the severity of the claimant's condition before the expiration of his or her insured status." *Ivy*, 898 F.2d at 1049 (citing *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984); *Parsons v. Heckler*, 739 F.2d 1334, 1340 (8th Cir. 1984) (finding that the court may consider any medical, psychological, or psychiatric evaluations made after the expiration of the claimant's insured status because "the mere fact that the examination was made following the expiration of insured status does not automatically make the examination irrelevant")). Recognizing that "[r]etrospective medical diagnoses constitute relevant evidence of pre-expiration disability", the Fifth Circuit explained that "properly corroborated retrospective medical diagnoses can be used to establish disability onset dates" and that "lay person evidence may properly

corroborate retrospective medical diagnoses." *Malone v. Comm'r of Soc. Sec.*, 186 F. Supp. 3d

553, 561 (N.D. Miss. May 3, 2016) (quoting *Likes v. Callahan*, 112 F.3d 189, 191 (5th Cir. 1997)

(internal quotation marks omitted)).

### 1. Depression

Plaintiff argues that the ALJ "ignore[d]" clinical findings that supported his medically

diagnosed impairment of depression. (doc. 19 at 10.)

Here, in February 2017, less than two months after Plaintiff's DLI, First Psychological

Associate and Psychologist completed an initial behavioral medicine assessment, on referral from

Treating Chiropractor to "assess [Plaintiff's] emotional status and to determine [its] relationship

to the work accident." (doc. 16-2 at 98-104, 317.) They noted that his Beck Depression Inventory-

II score indicated moderate depression, diagnosed him with major depressive disorder moderate,

and recommended medication treatment. (*Id.* at 102-04.)

The ALJ expressly reviewed the record and found the following:

> Regarding [Plaintiff]'s alleged depression, there is no definite diagnosis. Therefore, this is
> not a medically determinable impairment. … In this case, there is no evidence of a
> medically determinable mental impairment prior to the expiration of the [DLI]. [Plaintiff]
> generally denied experiencing any mental symptoms. Further, mental status exams were
> within normal limits. [He] has not been prescribed any medication for depression and he
> did not treat with a counselor or therapist (Prior Hearing Testimony).

(doc. 16-1 at 28-29) (internal citations and legal standard omitted). While not discussed by the

ALJ, the record shows that the day of his work injury in November 2014 Plaintiff was alert,

oriented times three, cooperative, attentive, and he denied hopelessness, depression, and any

psychiatric problems. (*Id.* at 595-96, 600-01.) The next day, he again had a normal mental

examination, and he denied experiencing anxiety, depression, or agitation. (*Id.* at 611-612.) For

the next two years, 7 different providers found at least 23 times that Plaintiff had normal mental

status examinations and that he denied any psychiatric symptoms. (docs. 16-1 at 635, 646, 666,

695, 701, 708, 714, 725, 728-29, 736, 744, 754-56, 763, 784, 791, 797; 16-2 at 40, 165, 266-67, 270, 279, 285, 291, 533.) Accordingly, the record does not contain the requisite objective medical evidence to establish his diagnosed depression as a medically determinable impairment prior to his last date insured. *See Ivy*, 898 F.2d at 1048 (requiring that claimants establish a disabling condition before their post-DLI); *see also* 20 C.F.R. § 404.1529(b) (requiring "[m]edical signs and laboratory findings" to show the existence of a medical impairment).

Plaintiff first argues that the ALJ was not permitted to ignore "clinical findings", like the assessment by First Psychological Associate and Psychologist, that support his diagnosed depression. (doc. 19 at 10.)  The Social Security regulations "do not require an ALJ to state the weight given to each symptom and diagnosis in the administrative record". *See Proge v. Comm'r of Soc. Sec.*, No. 3:13-CV-310-SAA, 2014 WL 4639462, at *4 (N.D. Miss. Sept. 16, 2014) (applying 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)). Because Plaintiff failed to present any lay testimony to corroborate his retrospective medical diagnosis, he has not shown that the ALJ erred by ignoring his mental providers' post-DLI assessment. (docs. 16-1, 16-2, 19, 21); *see Malone*, 186 F. Supp. 3d at 561 (requiring corroboration of retrospective medical diagnosis); *Leggett*, 67 F.3d at 564 (requiring claimant to prove disability under the first four steps of the analysis).

Plaintiff further argues that an ALJ "is required to consider the impact of a non-severe impairment on a claimant's ability to work", but he concedes that "an ALJ is NOT required to consider the impact of a non-medically determinable impairment on a claimant's ability to work." (doc. 19 at 10-11) (capitalization in original). Because the ALJ found that Plaintiff's depression was a non-medically determinable impairment (not a non-severe impairment), the ALJ was not required to consider the impact of Plaintiff's medically diagnosed depression in making his determination, and he did not err. (doc. 16-1 at 28-29); *see Leggett*, 67 F.3d at 564; 20 C.F.R.

§ 404.1521 (establishing a medically determinable impairment).

Because the ALJ relied on medical evidence in the record and Plaintiff's own testimony in finding that his depression was not a medically determinable impairment before his DLI, his decision was supported by substantial evidence. *See Greenspan*, 38 F.3d at 236 (noting in applying the substantial evidence standard, a reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment); *Leggett*, 67 F.3d at 564 (stating that a reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record).

### 2. *Mild Neurocognitive Disorder*

Plaintiff also argues that the ALJ "made an even more egregious error" by failing to consider his "medically diagnosed neurocognitive disorder, associated with his traumatic brain injury." (doc. 19 at 11.)

Here, as noted, in February 2017, First Psychological Associate and Psychologist found that Plaintiff was "likely" impaired in motor speed, psychomotor speed, and simple attention, they diagnosed him with mild neurocognitive disorder due to traumatic brain injury, and they recommended therapy and a neuropsychological evaluation. (doc. 16-2 at 98-104.) In May 2017, Second Psychological Associate and Psychologist found that Plaintiff may be limited in completing tasks, thinking things through, and following new instructions where "significant" memory functions or "high" concentration demands were required, and they confirmed his diagnosis of mild neurocognitive disorder due to traumatic brain injury. (*Id.* at 509-23.) Months later, Plaintiff's cognitive impairment diagnosis was confirmed by Fifth Examiner and Fourth Examiner. (*Id.* at 486-92, 497-501.) The ALJ did not, however, consider this diagnosed condition. (doc. 16-1 at 22-35.) Nevertheless, Plaintiff presents no objective or lay evidence to corroborate

this retrospective diagnosis. *See Malone*, 186 F. Supp. 3d at 561; *Leggett*, 67 F.3d at 564. Absent sufficient corroboration, the record does not contain requisite evidence needed to establish a medically determinable mental impairment of cognitive brain impairment due to traumatic brain injury during the relevant period. (doc. 16-2 at 98-104, 509-23); *see King v. Barnhart*, 372 F. Supp. 2d 932, 942 (S.D. Tex. Mar. 17, 2005) (finding that claimant "merely testified as to his current condition and the results of his impairments rather than his condition [pre-DLI]"); *Torres*, 48 F.3d at 894 n. 12 (degeneration of a condition post-DLI is not relevant to the Commissioner's Title II disability analysis).

The only affirmative evidence in the record of a possible pre-DLI mental impairment is found in Fourth Examiner's July 2017 impairment rating, in which he states that Treating Chiropractor referred Plaintiff for a psychological evaluation on December 14, 2016, two weeks before his DLI. (doc. 16-2 at 317.) His report did not explain why the psychological evaluation was ordered, however, and "[s]peculation of this sort is not a substitute for substantial evidence". *Delgado v. Barnhart*, 305 F. Supp. 2d 704, 713 (S.D. Tex. Feb. 19, 2004) (citing *White ex rel. Smith v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1999) ("Speculation is, of course, no substitute for evidence, and a decision based on speculation is not supported by substantial evidence.")).

Because the "medical records failed to establish that [Plaintiff] had a medically determinable mental impairment prior to [his DLI], and the [Psychological Associates and Psychologist] completing the [evaluation and assessment] failed to provide any basis to support [any] contention that [Plaintiff]'s mental health problems began [before December 31, 2016] and were incapacitating by [the time his insured status lapsed]", there was not sufficient corroboration of Plaintiff's alleged mental impairments pre-DLI. *See King*, 372 F. Supp. 2d at 942; *Torres*, 48 F.3d at 894 n. 12. The ALJ did nor err, and remand is not warranted on this issue.

36

**C.  <u>Remand for Award of Benefits</u>**

Plaintiff next contends that remand for an award of benefits is warranted due to "extraordinary delay" and substantial evidence of record showing he is disabled and entitled to benefits. (doc. 19 at 14-16.)

The Social Security regulations provide that the district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If an ALJ's decision is not supported by substantial evidence, the case may be remanded "with the instruction to make an award if the record enables the court to determine definitively that the claimant is entitled to benefits." *Armstrong v. Astrue*, No. 1:08-CV-045-C, 2009 WL 3029772, at * 10 (N.D. Tex. Sept. 22, 2009). District courts in this circuit have refused to remand a case if a claimant did not meet "the very high burden of establishing 'disability without any doubt.'" *Id.* at *11 (citation omitted); *see*, *e.g., Hart-Bevan v. Kijakazi*, No. 4:21-CV-145-ALM-KPJ, 2022 WL 4480316, at *9 (E.D. Tex. Sept. 9, 2022), *report and recommendation adopted*, No. 4:21-CV-00145ALMKPJ, 2022 WL 4474259 (E.D. Tex. Sept. 26, 2022) (rejecting a request to remand for an award of benefits because claimant made no showing of a disability without any doubt under *Armstrong*); *Cockshutt v. Saul*, No. 3:19-CV-0896-BH, 2020 WL 6393000, at *6 (N.D. Tex. Nov. 2, 2020) (same); *see also*, *e.g., Rivera v. Saul*, 475 F. Supp. 3d 71, 79 (D. Mass. July 31, 2020) (requiring a showing of disability without any doubt); *Lindsey v. Colvin*, 208 F. Supp. 3d 1239, 1251 (N.D. Ala. Sept. 22, 2016) (citing *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993) (same)). Inconsistencies and unresolved issues in the record preclude an immediate award of benefits. *Wells v. Barnhart*, 127 F. App'x 717, 718 (5th Cir. 2005) (per curiam). The Commissioner, not the court, resolves evidentiary conflicts. *Newton*, 209 F.3d at 452.

Here, Plaintiff argues that he is entitled to an award for benefits in part due to "extraordinary delay", citing *Diaz v. Berryhill*, 388 F.Supp.3d 382 (M.D. Pa. July 3, 2019). (doc. 19 at 14-15.) In *Diaz*, the district court in Pennsylvania set forth a two-part test for determining whether remand for an award of benefits is appropriate: (1) "whether there has been an excessive delay in the litigation of the claim which is not attributable to the claimant"; and (2) "whether the administrative record of the case has been fully developed and substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits". *See* 388 F.Supp.3d at 391. "This case is non-binding on this court, and [it] has not been cited as persuasive authority in any case within the Fifth Circuit", however. *Guidry v. Comm'r of Soc. Sec.*, No. CV 15-1857, 2016 WL 4574576, at *7 (W.D. La. Aug. 9, 2016), *report and recommendation adopted*, No. CV 15-1857, 2016 WL 4626248 (W.D. La. Aug. 31, 2016). Moreover, persuasive caselaw outside the Fifth Circuit is "irrelevant" when there is binding law from the Fifth Circuit. *See Green v. Apfel*, No. CIV. A. 97-3108, 1999 WL 179470, at *5 n.4 (E.D. La. Mar. 26, 1999).

It does not appear that the Fifth Circuit has specifically considered whether extraordinary delay is a basis for an award of benefits, but it has affirmed district court orders remanding cases for an award of benefits when there is evidence of an extensive record, a lengthy administrative process due to no fault of the claimant, an ALJ's decision unsupported by substantial evidence, and/or a claimant who is actually disabled. *See, e.g., McQueen v. Apfel*, 168 F.3d 152, 156 (5th Cir. 1999) (reversing the district court's denial of benefits that was not supported by substantial evidence because the Commissioner had ignored "necessary" evidence without "good cause", and remanding for an award of benefits *despite inconclusive evidence as to claimant's disability* because his case had been pending for about 5 years); *Randall v. Sullivan*, 956 F.2d 105, 109 (5th Cir. 1992) (noting the "extensive" medical record and affirming the lower court's remand to award

benefits where it would be "unconscionable to remand this eight year old case to the Secretary for further review"); *Taylor v. Bowen*, 782 F.2d 1294, 1299 (5th Cir. 1986) (reversing the district court's denial of benefits and remanding for an award of benefits because substantial evidence did not support the ALJ's finding that claimant had "recovered or would recover" within a 12-month period after his motor vehicle accident, and the "only indications" in the record suggesting the opposite proved "inaccurate"); *Deters v. Sec'y of Health, Educ. & Welfare*, 789 F.2d 1181, 1186 (5th Cir. 1986) (finding remand for an award of benefits was warranted because the ALJ ignored objective medical evidence of disability and the Commissioner's denial lacked substantial evidence when "[v]iewing the entire record as a whole"); *see also Shelton v. Astrue*, No. 1:08-CV-403, 2011 WL 1234910, at *2 (E.D. Tex. Jan. 31, 2011) (collecting district and appellate court cases "[g]enerally" involving "egregiously long delays in the administrative process, coupled with repeated administrative errors requiring multiple reversals and rehearings, and claimants who are actually disabled", and finding remands for further review "unnecessary", "contraven[ing] fundamental justice", "grossly unfair", or "perpetuat[ing] a ridiculous or out-of-control administrative process") (internal footnote omitted)), *report and recommendation adopted*, No. 1:08-CV-403, 2011 WL 1191946 (E.D. Tex. Mar. 30, 2011).[18]

District courts within the Fifth Circuit have remanded cases for an award of benefits on similar grounds. *See, e.g., Jimmerson v. Apfel*, 111 F. Supp. 2d 846, 850-51 (E.D. Tex. Aug. 21, 2000) (citing *Randall* and finding that remand for further review was "unconscionable" in 8-year-old case that had been remanded twice and that had a 400-page record that "affirmatively

---

[18] *But see McQueen*, 168 F.3d at 157, 158 n.6 (Garza, Emilio M., J., concurring) ("When the evidence is not substantial, we remand with the instruction to make an award if the record enables us to determine definitively that the claimant is entitled to benefits. … I appreciate that allowing the Commissioner to take additional evidence would prolong a dispute that has lasted more than five years. To counteract this situation, I would urge the Commissioner to expedite his consideration, giving final resolution of McQueen's application highest priority.").

establishe[d]" the claimant's illiteracy, contradicting the ALJ's finding that he had a "marginal education"); *Mericle v. Sec'y of Health & Hum. Servs.*, 892 F. Supp. 843, 847 (E.D. Tex. July 5, 1995) (remanding for an award of benefits under *Randall*, because the case had been pending at the administrative and judicial levels for over 8 years and, but for the VE's unreliable testimony, "there is little doubt" that the ALJ would have concluded that there were not a significant number of jobs available); *see also*, *e.g., Jackson v. Berryhill*, No. 3:16-CV-2957-G-BK, 2017 WL 4457539, at *4 (N.D. Tex. Sept. 11, 2017) (remanding for an award of benefits based on a finding that the medical record was "replete" with evidence that claimant exhibited serious and persistent behaviors, symptoms, and signs to show that he met or equaled Listing 12.03), *report and recommendation adopted*, No. 3:16-CV-2957-G-BK, 2017 WL 4410812 (N.D. Tex. Oct. 3, 2017); *Robin v. Comm'r of the Soc. Sec. Admin.*, No. CIV.A. 13-2347, 2014 WL 4744689, at *2 (W.D. La. Sept. 23, 2014) (collecting cases).

Here, Plaintiff's claim has been pending for almost 7 years, the record surpasses 1,500 pages, and the case has required 3 ALJ decisions, 3 administrative hearings, and 3 Appeals Council remands. (*See* docs. 16-1, 16-2); *see also*, *e.g., McQueen*, 168 F.3d at 156 (remanding almost 5-year-old case for award of benefits); *Randall*, 956 F.2d at 109 (noting the "extensive" medical record in remanding 8-year-old case for an award of benefits). Plaintiff's disability claim lay dormant between May 2019 and August 2020, when the Appeals Council found, upon request for review, that Plaintiff's disability application had been inadvertently closed and no action had been taken on its first order; it vacated the first ALJ decision and directed the ALJ to set a hearing if requested, complete the administrative record, and issue a new decision. (doc. 16-1 at 161-62.) The evidence shows that due to no fault of his own, Plaintiff's case has been riddled with "repeated administrative errors requiring multiple reversals and rehearings", resulting in "egregiously long

delays in the administrative process". *Shelton*, 2011 WL 1234910, at *2 (describing some cases that have resulted in a remand for award of benefits).

Further, as noted, the third ALJ decision is not supported by substantial evidence. The ALJ rejected Spinal Surgeon's medical opinion without good cause, he erroneously attributed Fourth Examiner's comment about invalid testing to Second Examiner's opinion, and he summarily ignored Nurse Practitioner's opinion that provided vocational restrictions. (doc. 16-1 at 22-35); *see*, *e.g., McQueen*, 168 F.3d at 156 (remanding for an award of benefits because the Commissioner erred in ignoring necessary evidence without good cause); *Taylor*, 782 F.2d at 1299 (affirming for an award of benefits because substantial evidence did not support the ALJ's finding as to claimant's ability to perform work and the sole evidence supporting the finding was proved "inaccurate"). Notably, the ALJ's decision relied solely on Treating Chiropractor's opinion that Plaintiff could perform light work, but the ALJ found it only partially persuasive because it lacked support from the record and was inconsistent with Treating Chiropractor's own treatment notes. (doc. 16-1 at 33.) While not conclusive as to Plaintiff's disability, Spinal Surgeon's September 2016 and October 2016 work status reports limiting Plaintiff to a reduced range of sedentary work were instead consistent with Second Examiner and Nurse Practitioner's respective work status reports finding that Plaintiff could not perform the weight restrictions of light work. (*Compare id.* at 723, 776, *with id.* at 655, *and* doc. 16-2 at 281, 287, 293.) Accordingly, when "[v]iewing the entire record as a whole", the third ALJ decision is not supported by substantial evidence. *See Deters*, 789 F.2d at 1186.

Because the third ALJ decision is unsupported by substantial evidence, this case has an "extensive" 1500-page medical record, and it has been pending at the administrative and judicial levels for almost seven years, it would be "unconscionable" to remand it to the Commissioner for

further review. *See*, *e.g., Randall*, 956 F.2d at 109 ("Because of the medical record, we think it unconscionable to remand this eight year old case to the Secretary for further review."); *McQueen*, 168 F.3d at 156 (remanding for an award of benefits because "[o]wing to the Commission's error, McQueen has been without disability benefits for [about five] years while his case wound its way to this Court"); *see also Shelton*, 2011 WL 1234910, at *3 ("[T]he core rationale seems to be that the Commissioner is not entitled to limitless opportunities to repair a record. At some point, the Commissioner runs out of time, and courts justifiably may conclude that further administrative proceedings serve no useful purpose, but rather would cross the line to a miscarriage of justice."). Accordingly, Plaintiff's request for remand for benefits should be granted.[19]

## IV.    CONCLUSION

The Commissioner's decision should be **REVERSED** and the case should be **REMANDED** with instructions for the Commissioner to grant Plaintiff's disability insurance benefits application and to calculate benefits due to him consistent with this recommendation.

**SO ORDERED** on this 18th day of July, 2023.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[19] Because of the recommended remand for an award of benefits, Plaintiff's final issue pursuant to the U.S. Constitution's Appointments Clause is not reached.

42

## INSTRUCTIONS FOR SERVICE AND
## <u>NOTICE OF RIGHT TO APPEAL/OBJECT</u>

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b.) In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996.)

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

43